1  Bernard Max Resnick, Esq.
   Bernard M. Resnick, Esq., P. C.
2  Two Bala Plaza, #300
   Bala Cynwyd, PA 19004 USA
3  Telephone: (610) 660-7774
   Email: bmresnick@gmail.com
4
   Stella Havkin (SBN 134334)
5  Havkin & Shrago
   Attorneys at Law
6  5950 Canoga Avenue, Suite 400
   Woodland Hills, CA 91367
7  Telephone: (818) 999-1568
   Facsimile:  (818) 305-6040
8  Email: stella@havkinandshrago.com
9
10 Attorneys for Plaintiff Buyer Structured Asset Sales, LLC, a Nevada Limited Liability Company

11

12                    **UNITED STATES BANKRUPTCY COURT**

13                    **CENTRAL DISTRICT OF CALIFORNIA**

14                       **SAN FERNANDO DIVISION**

15 In re                              )
                                      )  Case No.  1:10-bk-21216-MT
16                                    )  Adv. No.
   Anthony Henderson aka Kayzie Bone dba Bone )
17 Thugs n Harmony,                   )  Chapter 7
                                      )
18    Debtor.                         )  **COMPLAINT FOR:**
                                      )
19 ─────────────────────────────     )  **(1) DECLARATORY RELIEF;**
                                      )
20 Structured Asset Sales, LLC, a Nevada Limited )  **(2) PRELIMINARY AND**
   Liability Company,                 )      **PERMANENT INJUNCTION;**
21                                    )
       Plaintiff,                     )  **(3) ACCOUNTING; AND**
22                                    )
       vs.                            )  **(4) TURNOVER**
23                                    )
   SoundExchange, Inc,; Anthony Henderson aka )
24 Kayzie bone dba Bone Thung n Harmony, )
                                      )
25    Defendants                      )
   ─────────────────────────────
26

27

28
   Complaint

**TO THE HONORABLE MAUREEN TIGHE, UNITED STATES BANKRUPTCY JUDGE, DEBTOR, DEFENDANT SOUNDEXCHANGE, INC. AND ALL INTERESTED PARTIES:**

Plaintiff Structured Asset Sales, LLC, through its attorneys of record, files its complaint against Defendants SoundExchange Inc. ("SoundExchange") and Anthony Henderson aka Kayzie bone dba Bone Thung n Harmony ("Debtor") as follows:

## VENUE AND JURISDICTION

1.    This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to the provisions of 28 U.S.C. §§1334 and 157.  This adversary proceeding relates to the Chapter 7 case of Anthony Henderson aka Kayzie bone dba Bone Thung n Harmony case number case number 1:10-bk-21216-MT, filed in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division

2.    Venue is proper herein pursuant to the provisions of 28 U.S.C. §§1408 and 1409.

## THE PARTIES

3.    Structured Asset Sales LLC ("SAS") is a Nevada limited liability company.

4.    Defendant SoundExchange Inc. is the organization which is officially recognized by U.S. Congress as the agency charged with collecting and distributing "Digital Performance Royalties" payable by digital service providers ("DSP"'s) to owners of master sound recordings, featured performers of master sound recordings, producers and engineers of master sound recordings.

5.    Defendant Anthony Henderson aka Kayzie bone dba Bone Thung n Harmony is the Debtor in this case.  The Debtor is a songwriter and recording artist of some renown, having been successful both as a member of the group "Bone Thugs & Harmony" and as a solo songwriter/recording artist.  On September 7, 2010, the Debtor filed a voluntary petition under

Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States

Bankruptcy Court for the Central District of California.

## **BACKGROUND**

6.    Prior to filing the Bankruptcy Case, at the behest and invitation of the recording

artist Hakeem Seriki, performing known as "Chamillionaire", and pursuant to a written agreement

between Chamillitary, Inc., furnishing the services of Hakeem Seriki, a/k/a "Chamillionare" and

Debtor dated as of November 1, 2005.   The agreement is attached hereto as an Exhibit "1."  The

Debtor had previously appeared as a featured recording artist on a master sound recording (the

"Master") and accompanying promotional music video (the "Video") entitled "Ridin".  The Video,

entitled "Chamillionaire ft. Krazyie Bone - Ridin' (Official Video)" can be found and viewed at the

following "youtube" website page: https://www.youtube.com/watch?v=CtwJvgPJ9xw.

7.    David Seror ("Trustee") was appointed by the Court as the Trustee in the instant

Bankruptcy case.  On May 27, 2016, SAS entered into an Asset Purchase Agreement with the

Trustee to purchase certain assets of Debtor.  A true and correct copy of the Asset Purchase

Agreement is attached hereto as an Exhibit "2."

8.    On August 23, 2016, after consideration of multiple offers and objections, this

Court issued an Order Authorizing and Approving Sale of Certain Estate Assets Free and Clear of

all Liens, Claims, Encumbrances and Interests (the "Court Order") of Debtor's estate to SAS,

deeming SAS to be a "Good Faith Purchaser" of Debtor's assets as listed in the Asset Purchase

Agreement.  A true and correct copy of the Court Order is attached hereto as an Exhibit "3."

9.    Paragraph 3.1.1.2 of the Asset Purchase Agreement references and defines the

"Purchased Assets" that SAS purchased from the Trustee, including specifically "the Estate's

rights to any of Debtor's intellectual property, including but not limited to all musical

compositions, works and songs, written in full or in part and/or performed in whole or in part by

the Debtor, whether scheduled or unscheduled…" as identified in Schedule A to the Purchase

Agreement and Court Order.  Paragraph 3.1.1.3 of the Asset Purchase Agreement lists and defines

all of the Debtor's Artist Royalty Payments which were included in the sale, and specifically

mentions royalties due from Chamillitary, Inc. and SoundExchange.  Inc.  The additional pages

attached to the Asset Purchase Agreement (Credits, Schedule A, Attachment 1, etc.) confirmed the

finality of the sale of the Debtor's assets to SAS and specifically mention Ridin', Chamillitary

and/or SoundExchange.

10.    The Debtor, who was represented by counsel in the prior bankruptcy proceedings,

had ample opportunity to correct, object to and/or clarify any element of the Asset Purchase

Agreement.  No objection was made to the listing or description of assets included within the Asset

Purchase Agreement, and the validity of those assets listed with the Asset Purchase Agreement was

not questioned.  This Court approved the sale of the Debtor's assets to SAS.

11.    For approximately twelve years, from 2005 to 2017, SoundExchange paid the

Debtor his share of featured artist royalties in connection with "Ridin", and the Debtor had

negotiated, deposited and/or cashed all checks and payments received from SoundExchange

regarding "Ridin".  SoundExchange's royalty statements to featured artists typically and clearly

state each recording upon which the featured artist has earned royalties, as well as the amount

payable.  The Debtor never claimed that any of the approximately 144 SoundExchange royalty

payments made to him in connection with Ridin' were wrongfully or mistakenly paid to him, nor

did the Debtor make any attempt to return any money to which he was not entitled.  Neither the

Debtor, Chamillitary, Hakeem Seriki nor SoundExchange ever attempted to challenge the validity

of the Debtor's right to share in SoundExchange's featured artist royalties payable in connection

with the Debtor's performance on "Ridin".  Thus, through his wrongful conduct, the Debtor

collected in excess of $100,000 in royalties.

12.     Despite receiving approximately 144 monthly royalty payments from

SoundExchange, pursuant to a purported "Affadavit" which is attached hereto as an Exhibit "4",

Debtor now claims that he is not a featured artist on Ridin', and therefore was never entitled to

SoundExchange royalties in connection with "Ridin".  In response to the Debtor's "Affadavit" and

over SAS' objection, SoundExchange has unilaterally elected to suspend payments to SAS and

instead make all future digital performance royalty payments in connection with "Ridin" to

Hakeem Seriki a/k/a "Chamillionaire".

13.     In an email message dated April 29, 2020 from the Trustee to David Pullman,

authorized representative of SAS, the Trustee stated:

"To Whom it May Concern:

Attached is the order approving the sale and the asset purchase agreement,

assignment and bill of sale which is final and binding, this means Structured Asset

Sales, LLC is entitled to the SoundExchange royalties of Ridin. – David Seror".

ant and makes the following motion for Declaratory Judgment that it is entitled to Anthony

"Krayzie Bone" Henderson's share of SoundExchange digital performance royalties payable in

connection with the master recording known as "Ridin'" by the recording artist Hakeem Seriki,

a/k/a "Chamillionaire".

14.     The Debtor's performance on "Ridin" qualifies as a Featured Artist within

the meaning of 17 U.S.C. §114(g)(2)(D), and therefore, entitled him to receive a portion of

Featured Artist royalties collected and paid by SoundExchange, in perpetuity.

15.     In addition, during the period from 2010 through 2017 while he was in his

Bankruptcy case, the Debtor collected, without disclosing to the Court or to the Trustee,

royalties on many of his songs listing Exhibit "A" to the sale order which is attached to

Exhibit "2."   Since SAS purchased all the assets from the Estate in connection with the

1    Debtor's songs, through this complaint, SAS seeks turnover from the Debtor of all funds

2    that he collected on his songs from SoundExchange or otherwise, amount which SAS

3    believes to be in excess of $100,000.

4
                              **FIRST CLAIM FOR RELIEF**
5
            **(DECLARATORY RELIEF PURUSAN TO 28 U.S.C. §2201 AGAINST ALL
6                                        DEFENDANTS)**

7        16.    Plaintiff refers to and incorporates by reference each and every allegation contained

8    in paragraphs 1 through 15, inclusive, as though fully set forth herein.

9        17.    A dispute has arisen and an actual controversy now exists between SAS and

10   Defendants concerning their respective ownership rights vis a vis the royalties due in connection

11   with the song "Ridin".

12       18.    SAS therefore requests a judicial declaration of the rights and obligations of

13   the parties with regard to their respective interests in the song "Ridin" based on the following"

14
         19.    SAS disagrees with the Debtor's "Affadavit" and SoundExchange's
15
16   assertion that SAS is not entitled to the Debtor's share of SoundExchange royalties due in

17   connection with "Ridin".  SAS disagrees with the Debtor's contention and

18   SoundExchange's decision that the Debtor was never entitled to featured artist royalties.

19   Other than a blanket and unsubstantiated denial of SAS' position that the Debtor qualifies

20   as a Featured Artist within the meaning of United Stated Copyright Law, SoundExchange

21   has neither provided any legal authority for its refusal to segregate and escrow the Featured
22
     Artist royalties due in connection with "Ridin" nor continued making payment of the
23
24   Debtor's share of SoundExchange royalties to SAS, who is the Court approved purchaser

25   of the Debtor's estate's assets.

26       20.    SAS respectfully questions the validity, motivation and relevancy of the

27   Debtor's "Affadavit" dated March 10, 2020, which is based solely upon what SAS

28   contends is an incorrect reading of the Featured Artist contract which  the Debtor attached

as an Exhibit to his "Affadavit". The original, underlying agreement between Chamillitary Inc. and the Debtor is the relevant document and not the Debtor's interpretation as set forth in the "Affadavit". Parol evidence or oral assertions offered by the Debtor, 15 years after the original agreement was executed and which reflected the parties' intentions and agreement, is irrelevant.

21.     Nothing in the underlying November 1, 2005 agreement indicates that the Debtor waived his right to SoundExchange royalties, or to be considered a "featured performer" under 17 U.S.C. §114(g)(2)(D). The underlying agreement between the parties makes no mention of a "buyout" of Mr. Henderson's SoundExchange royalties. SoundExchange is never even mentioned in this underlying November 1, 2005 agreement, and (unlike for producers and engineers) it is not necessary to formally memorialize a featured performer's entitlement to SoundExchange royalties within a written contract or Letter of Direction to be delivered to SoundExchange. The determination of whether or not someone qualifies as a "featured artist" is factual, and the facts of this matter, in particular (i) the credit provision in the November 1, 2005 agreement; (ii) the cover art of the publicly-released single version of "Ridin"; (iii) the frequency of Debtor's visual appearance in the promotional music video of "Ridin" and (iv) the length of Debtor's "lead vocal" performance of the master sound recording of Ridin, clearly demonstrate that Mr. Henderson is indeed a "featured performer" under 17 U.S.C. §114(g)(2)(D), and therefore entitled to a portion of SoundExchange royalties due in connection with "Ridin". The $10,000 fee paid to the Debtor, as described in detail in the November 1, 2005 agreement was for the Debtor's performance on the master recording and his appearance in the promotional, short form music video. If there was any possible question about who may (or may not) be entitled to receive such revenue, the parties would have resolved the issued by including a specific waiver of potential SoundExchange revenue in the November 1, 2005 agreement. No such waiver was included in the November 1, 2005 agreement. Absent a specific waiver of the Debtor's entitlement to SoundExchange royalties in the

6
COMPLAINT

body of the November 1, 2005 agreement, the terms of the agreement control the situation and not the Debtor's" Affadavit" attempting to rewrite history.

22.    The salient facts are:

(a) The parties intended the Debtor to be credited as featured performer. The credit provision of the November 1, 2005 agreement is specific on this point, and in Paragraph 4 of the agreement, it grants the "Featuring Krazie Bone" credit to the Debtor.

(b) The Debtor is also credited in the title of the recording as publicly released: (See attached Exhibit "4" for a reproduction of the cover art for this single, which specifically states "ft. Krazie Bone".)

(c) SoundExchange paid the Debtor a share of the featured artist royalty for approximately twelve years.  Like Mr. Seriki, Debtor accepted approximately 144 monthly payments and statements without complaint or attempting to "correct" the alleged mistake. SoundExchange's monthly royalty statements to the Debtor clearly state each recording upon which he earned royalties, as well as the amount payable to him.  Neither SoundExchange, Mr. Seriki nor the Debtor claimed that there were errors with the division of royalty payments which continued for over a decade.  The Debtor, Mr. Seriki and SoundExchange cannot undo the past by now claiming that the Debtor was never entitled to his featured artist share of SoundExchange royalties which he is now attempting to do through Paragraph 3 of the "Affadavit".

(d) Debtor's performance on both the audio recording and the promotional video is significant, as he is the "lead vocalist" on the recording and the focus of the camera in the video for lengthy periods of time.  These acts make the Debtor a "recording artist or artists featured on such sound recording" within the meaning of 17 U.S.C. §114(g)(2)(D).

(e) SAS purchased the Debtor's royalty assets unconditionally through the Bankruptcy Court process. The Asset Purchase Agreement, approved by this Court, clearly sets forth both Chamillitary and SoundExchange in numerous sections and attachments. All parties understood what assets were being sold and which assets were included in the Debtor's Estate. At no time prior to the sale or during the sale process did the Debtor make any attempt to have Chamillitary and SoundExchange removed from the Asset Purchase Agreement as containing any mistakes. Now, years after the assets were sold, the Debtor seeks to rewrite history and makes claims which at best are irrelevant and at worth, in bad faith.

**SECOND CLAIM FOR RELIEF**

**(PRELIMINARY AND PERMANENT INJUNCTION AGAINST ALL DEFENDANTS)**

23. Plaintiff refers to and incorporates by reference each and every allegation contained in paragraphs 1 through 22, inclusive, as though fully set forth herein.

24. Defendant SoundExchange has taken the position that SAS who purchased all rights to the song "Ridin" is not entitled to royalties because the Debtor provided a false declaration to the SoundExchange. Based on the false declaration, Defendant SoundExchange has taken the position that it will not pay SAS the royalties to which it is entitled. SoundExchange's wrongful conduct unless and until enjoined and restrained by an order of this Court, will cause great and irreparable injury to Plaintiff.

25. SAS does not have any speedy or adequate remedy at law for the damages that will be suffered if SoundExchange will distribute the royalties to third parties who have no right to the royalties. Therefore, SAS asserts that it is necessary to enjoin Defendants from distributing the royalties owed to it pending the resolution of the instant.

COMPLAINT

**THIRD CLAIM FOR RELIEF**

**(ACCOUNTING AGAINST ALL DEFENDANTS)**

26.     Plaintiff refers to and incorporates by reference each and every allegation contained in paragraphs 1 through 25, inclusive, as though fully set forth herein.

27.     Defendants have exclusive possession of the books, records and accounts that will clarify the amount of royalties that the Debtor improperly collected on the song "Ridin" for over a decade as well as the royalties the Debtor improperly collected on all his songs between the years 2010 and 2017.   SAS needs an accounting of the moneys received by the Debtor over the past ten years, what has happened to the moneys that the Debtor collected from SoundExchange or otherwise to which he was not entitled and how much of it is left.   Thus, SAS has filed the instant adversary proceeding to seek such an accounting.

**FOURTH CLAIM FOR RELIEF**

**(TURNOVER AGAINST THE DEBTOR)**

28.     Plaintiff refers to and incorporates by reference each and every allegation contained in paragraphs 1 through 27, inclusive, as though fully set forth herein.

29.     The Debtor has been improperly collecting royalties for the song Ridin" for the past ten years.   Further, during the period from 2010 through 2017 while he was in his Bankruptcy case, the Debtor collected, without disclosing to the Court or to the Trustee, royalties on many of his songs listing Exhibit "A" to the sale order which is attached to Exhibit "2."   Since SAS purchased all the assets from the Estate in connection with the Debtor's songs, through this complaint, SAS seeks turnover from the Debtor of all funds that he collected on his songs from SouthExchange or otherwise, amount of which is to be determined from discovery, as well as turnover of the royalties that the Debtor improperly collected for the song "Ridin" from SouthExchange or otehwise.

**PRAYER FOR RELIEF**

WHEREFORE, SAS respectfully requests as follows:

1.   On its First Claim for Relief for judgment adjudicating that:

(a) That Debtor's performance on "Ridin" qualifies as a Featured Artist within the meaning of

17 U.S.C. §114(g)(2)(D);

(b) That SAS is entitled to continue to receive what otherwise would have been payable to  the

Debtor, including but not limited to all royalty payments in connection with the Debtor's

performance on "Ridin" due from SoundExchange, in perpetuity, without interruption, and

without discount; and

(c) That SoundExchange shall be ordered to make all retroactive, unpaid payments which have

accrued and which are due to SAS, and shall continue to make such payments to SAS in

perpetuity.

2.   On its Second Claim for Relief, for an injunction enjoining Defendant

SoundExchange from alienating, distributing or otherwise devaluing Plaintiff's interest in the

royalties for the song "Ridin" pending the resolution of the instant case.

3.   On its Third Claim for Relief, for an order requiring Defendants to turn over their

records regarding the royalties that have been distributed to the Debtor for the past ten years.

4.   On its Fourth Claim for Relief, for turnover of all moneys that the Debtor has

collected for the past ten years for the song "Ridin" as well as royalties improperly collected by the

Debtor on all his songs from SoundExchange or from other sources during the period between

2010 and 2017.

5.   That Plaintiff be awarded its costs of suit incurred herein and for such other and

further relief as this Court deems proper.

Dated: July 14, 2020                     **HAVKIN & SHRAGO**


By:   */s/ Stella Havkin* _____
                Stella Havkin
                Attorneys for Buyer Structured Asset Sales, LLC

COMPLAINT

**EXHIBIT 1**

CHAMILLITARY, INC
F/S/O HAKEEM SERIKI P/K/A CHAMILLIONAIRE
c/o Davis Shapiro Lewit Montone & Hayes
689 Fifth Avenue, 5th Floor
New York, New York 10022
Attn: Fred Davis, Esq.

As of November 1, 2005

Track Fiend Productions, LLC
f/s/o Anthony Henderson
professionally known as "Krayzie Bone"
c/o Law Offices of Bret D. Lewis
Santa Monica Wellesley Plaza
12304 Santa Monica Blvd.--#PH
Los Angeles, CA 90025

Gentlemen:

This letter will constitute our agreement regarding your furnishing the services of Anthony Henderson professionally known as "Krayzie Bone" (hereinafter "Side Artist") (hereinafter Track Fiend Productions, LLC and Side Artist are individually and collectively referred to as "you") with respect to the musical performances of Krayzie Bone as a sideartist on one (1) master recording(s) (each a "Master" and collectively the "Masters") titled "Ridin'" embodying the performances of the recording artist p/k/a "Chamillionaire" (the "Artist") for inclusion on the album (the "Album") to be delivered by us to Universal Records ("Company") for the manufacture and distribution of records and other uses of the Masters pursuant to the agreement between Company and us dated September 24, 2004 (the "Recording Agreement"). Side Artist hereby acknowledges that Side Artist is not signed to an exclusive agreement regarding Side Artist's services as a recording artist with any third party or entity and that neither Company nor Recording Artist will be required to obtain clearance from any third party in connection with Side Artist's services hereunder.

1.    **Services:**

    (a)    Beginning on the commencement of the recording of the Master(s) and ending on Company's acceptance of the Master(s), you will render your musical performances (including, without limitation, subject to your prior professional commitments, to appear in a video (the "Video") embodying the Master) (the "Performances") pursuant to a schedule designated by you and us (and subject to the approval of Company). We hereby acknowledge satisfactory completion of the Performances (excluding your performances with respect to the Video which you hereby acknowledge that you have, as of the date of your execution of this

1

agreement, yet to perform), subject to your representations and warranties set forth herein and our right to require complete and proper performance in connection therewith.

(b)    All recordings embodying the Performances (including, without limitation, the Master(s) (together with all reproductions derived therefrom and the performances embodied thereon)(the "Recording(s)") shall, from the inception of creation:

> (i) be the sole property of us and/or Company and/or our and/or Company's designees throughout the Territory, free from any claims whatsoever by you or any other person and/or entity; and we and/or Company and our and/or Company's designees shall have the exclusive right to copyright such recordings in its name(s) as the sole owner and author thereof and to secure any and all renewals and extensions thereof throughout the universe (the "Territory"); and

> (ii)    be considered a "work made for hire" for us and/or Company within the meaning of the Copyright Act of 1976 (Title 17, U.S.C.), as amended. If, for any reason, it is determined that a Recording and/or Master does not so qualify (as a "work made for hire"), then the Recording and/or Master, together with all rights, title and interest therein and thereto, (including, without limitation, all copyrights therein (inclusive of the sound recording copyright)), are hereby deemed automatically and irrevocably transferred and/or assigned to us and/or Company and/or our and/or Company's designee by this agreement.    In the event you fail to execute any such documents or instruments (pertaining to the aforementioned transfer and/or assignment), then you hereby irrevocably grant to us and/or Company the power to do so on your behalf. You hereby irrevocably and unconditionally waive any and all moral and like rights that you might have in any such Recordings and hereby agree not to make any claim against us or Company or any party authorized by us and/or Company to exploit such Recordings based on such moral or like rights.

(c)    Without limiting the generality of the foregoing, Company and we, and Company's and our designees, as the case may be, shall have the exclusive unrestricted and perpetual right throughout the Territory to use, distribute, sell and exploit the Recording(s) and/or Master(s) in any and all media (including, without limitation, to manufacture records, videos and other derivatives thereof by any method now or hereafter known, derived from such Recordings, and to sell, market, transfer or otherwise deal in the same under any trademarks, trade names and labels, or to refrain from such manufacture, sale and dealing.

(d)    You will complete your performances hereunder on a date to be designated by you and us and in such a professional manner that the resulting Master(s) shall be

2

commercially and technically satisfactory as judged by Company and us. We hereby acknowledge that we have deemed the Master to be commercially and technically satisfactory, subject to your representations and warranties set forth herein and our right to require complete and proper performance in connection therewith.

2.    **Fee:**

Provided you are not in material breach hereunder, we shall cause Company to pay to you a non-recoupable fee (the "Fee") of Ten Thousand Dollars ($10,000) for all of your services (including, without limitation, your appearance in the Video) and the services of all musicians engaged by you, in connection with the Master. For the avoidance of doubt, the Fee shall be inclusive of any monies due to third parties engaged by you, including, without limitation, any and all union fees, session fees and costs which union fees you hereby acknowledge and agree that Company may deduct from the amount of the Fee otherwise payable to you hereunder. The Fee will be payable promptly following the complete execution of this agreement. You hereby instruct us to direct Ten Percent (10%) of the Fee to Bret D. Lewis, Esq., Santa Monica Wellesley Plaza, 12304 Santa Monica Blvd.--#PH, Los Angeles, CA 90025, tax payer identification number: _____. Our compliance with this authorization will constitute an accommodation to you alone, and nothing herein shall vest in Bret D. Lewis, Esq. rights as a beneficiary of or party to this instrument or any other agreement between you and us. All payments hereunder will constitute payment to you; we will have no liability by reason of any erroneous payment we may make or failure to comply with this authorization. You will indemnify and hold us harmless against any claims asserted against us and any damages, losses or expenses incurred by us by reason of any such payment or otherwise in connection herewith.

3.    **Payments:**

Payments hereunder shall be made payable and remitted as follows:

Track Fiend Productions, LLC
c/o Law Offices of Bret D. Lewis
Santa Monica Wellesley Plaza
12304 Santa Monica Blvd.--#PH
Los Angeles, CA 90025
Fed Tax ID#: 52-2186274

4.    **Credit:**

We shall instruct and use reasonable efforts to cause Company to accord you an appropriate credit on the liner notes of records derived from the Master in substantially the following form:

"Featuring "Krayzie Bone"

3

2038-4-10.3(EXECUTION) /121405

Our inadvertent, non-repetitive failure to comply with the foregoing shall not be deemed to be a breach of this agreement; provided that following notice from you, we shall instruct Company to cure any such failure, on a prospective basis with respect to future manufacturing runs.

5.    **Name and Likeness:**

You hereby grant to us and Company the right to use your name, approved likeness and approved biographical material concerning you in connection with the sale, advertising and promotion of the Album, other records derived from the Album and other records derived from the Master(s). You shall have a right of reasonable approval for all likenesses of you and biographical material concerning you used by us and/or Company in such connection, provided that any objections must be specific, in writing and received by us within five (5) business days after you have received the applicable likenesses and/or biographical materials. The inadvertent failure to obtain such approval shall not be deemed a breach hereof. Your approval shall be deemed given in the event that you shall fail to submit objections in accordance with the provisions of this paragraph. Once you have approved such likenesses and/or biographical materials, the same need not be approved again in respect of any subsequent use thereof.

6.    **Representation and Warranties:**

You hereby represent and warrant that:

(a)    We shall not be required to make any payment of any nature for, or in connection with, the rendition of your services or the acquisition, exercise or exploitation of rights by us pursuant to this agreement, except as specifically provided herein;

(b)    To the extent of your contribution thereto, there shall be no liens, encumbrances or other charges against the Master(s) at the time of delivery, including, without limitation, any uncleared samples;

(c)    All materials furnished by you in connection with the Master(s) shall be original and not infringe upon or violate the rights of any third parties;

(d)    You are under no disability, restriction or prohibition, whether contractual or otherwise, with respect to your right to enter into this agreement and your right to grant the rights granted to us hereunder;

(e)    You own all right, title and interest in and to your performances contained on the Master(s);

(f)    You have the full right and power to enter into this agreement and to grant the rights granted hereunder, and are not bound by any agreement (including, without

4

limitation an exclusive recording agreement) which would restrict you from rendering such services or granting such rights; and

(g)    You will not re-record for any person or entity other than us or Company a master recording embodying any musical composition embodied in any Master for at least five (5) years from the date of delivery to us of the Master(s).

(h)    You warrant and represent that Side Artist is not signed to an exclusive agreement regarding Side Artist's services as a recording artist and that neither Company nor Artist will be required to obtain clearance from any third party in connection with Side Artist's services hereunder.

7.    **Indemnification:**

You agree to indemnify and hold us and our successors, assigns, agents, companies and licensees harmless against any claim, liability, cost and expense (including reasonable attorneys' fees and legal costs) in connection with any claim which is inconsistent with any agreement, covenant, representation, or warranty made by you herein which has been reduced to a final judgment or has been settled with your consent, which consent shall not be unreasonably withheld (it being understood that your consent shall be deemed given to any settlement not in excess of Five Thousand ($5,000) Dollars). Notwithstanding the foregoing, if you withhold consent to any settlement which we are willing to make, the foregoing indemnity shall apply and we may settle such claim in our sole discretion unless you promptly assume all costs attributable to the defense of such claim, demand or action, including, without limitation, court costs, reasonable attorney's fees, and direct expenses theretofore incurred by us in connection with said claim, demand or action, or furnish us with an acceptable bond guaranteeing such payment; provided that in the event you assume said costs, we shall nonetheless have the right to settle such claim, demand or action in our sole discretion without your consent, provided that in such event, the foregoing indemnification shall not apply with respect thereto. You will reimburse us upon demand for any payment made by us at any time after the date hereof including after the Term in respect of any claim, liability, damage or expense to which the foregoing indemnity relates. Pending the resolution of any such claim, we may withhold monies that would otherwise be payable to you under this agreement. If no action is commenced on such a claim within one (1) year, or if you post a bond reasonably satisfactory to us, any monies so withheld shall be released to you, subject to our rights to again withhold such monies if any such claim is reasserted.

8.    **Controlled Compositions:**

(a)    The musical compositions and other materials embodied on the Master, which are written or controlled, in whole or in part, by you or any entity owned or controlled by, or affiliated with, you ("Controlled Compositions") are hereby licensed to us and to Company upon the terms and conditions set forth in the Recording Agreement applicable to Controlled Compositions thereunder, including without limitation, reduced mechanical royalty rates payable in respect

5

2038-4-10.3(EXECUTION) /121405

of such Controlled Compositions; records for which mechanical royalties are payable, reserves, aggregate mechanical royalty "caps", synchronization and other uses, etc.. You hereby grant us and Company a royalty-free license to reproduce Controlled Compositions that are embodied on Masters hereunder in synchronization with and in time relation to visual images featuring Artist's performances in so-called "video programs," Upon my request you shall execute or cause your publishing designee to execute and deliver to me or Company, as applicable, all documents required by me or Company, as applicable, to effectuate the purposes of this paragraph **8**.

(b)  You hereby acknowledge that you control the following percentage in and to the underlying composition (exclusive of any conveyance of copyright in connection with any Samples) embodied in the Master currently entitled:

"Ridin'":          "Krayzie Bone":          10%

## 9.  <u>Definitions:</u>

For purposes of this agreement, unless otherwise specified herein, the definitions contained in the Recording Agreement shall apply.

## 10.  <u>Miscellaneous:</u>

(a)  All notices to be given by either party hereunder shall be in writing and shall be delivered by hand or by United States certified mail, postage prepaid, return receipt requested, to the address of each party as first set forth above until notice of a new address shall be duly given, except that royalty statements and any payments due hereunder, shall be sent to you at such address by regular mail.

(b)  You shall have the status of an independent contractor hereunder, and except for the purposes of subparagraph 1(b) above, nothing herein contained shall constitute or contemplate you as our or Company's agent or employee.

(c)  **YOU ACKNOWLEDGE AND AGREE THAT YOU HAVE READ THIS AGREEMENT AND HAVE BEEN ADVISED BY US OF THE SIGNIFICANT IMPORTANCE OF RETAINING AN INDEPENDENT ATTORNEY OF YOUR CHOICE TO REVIEW THIS AGREEMENT ON YOUR BEHALF. YOU ACKNOWLEDGE AND AGREE THAT YOU HAVE HAD THE UNRESTRICTED OPPORTUNITY TO BE REPRESENTED BY AN INDEPENDENT ATTORNEY. IN THE EVENT OF YOUR FAILURE TO OBTAIN AN INDEPENDENT ATTORNEY OR WAIVER THEREOF, YOU HEREBY WARRANT AND REPRESENT THAT YOU WILL NOT ATTEMPT TO USE SUCH FAILURE AND/OR WAIVER AS A BASIS TO AVOID ANY OBLIGATIONS UNDER THIS AGREEMENT, OR TO INVALIDATE THIS AGREEMENT OR TO RENDER THIS AGREEMENT OR ANY PART THEREOF UNENFORCEABLE.**

(d)  This agreement embodies the entire understanding of the parties with respect to the subject matter hereof, cannot be modified without an instrument in writing

6

signed by both parties, and shall be governed by and interpreted in accordance
with the laws of the State of New York applicable to agreements entered into and
wholly performed in said State, without regard to any conflict of laws principles.
You and we hereby agree that the exclusive jurisdiction and venue for any action,
suit or proceeding based upon any matter, claim or controversy arising hereunder
or relating hereto shall be in the state or federal courts located in the State and
County of New York.

If the foregoing accurately sets forth your understanding of the agreement between you and us
with respect to the subject matter hereof, please sign this letter where indicated below.

Very truly yours,

Chamillitary, Inc

By: _____
                    Authorized Signatory

**AGREED AND ACCEPTED:**

Track Fiend Productions, LLC

By: _____
        Authorized Signatory
        Fed. I.D. #: 54-2186274

INDUCEMENT AND GUARANTEE:

The undersigned has read and understands the foregoing agreement and agrees to all of the terms
and conditions thereof. The undersigned agrees to guarantee his performance, and all warranties,
representations, covenants and agreements made by Track Fiend Productions, LLC
under the foregoing agreement, and further agrees to look exclusively to Track Fiend
Productions, LLC for payment of all compensation due to him in connection with the
performance of his services as set forth above in the agreement.

_____
Anthony Henderson p/k/a "Krayzie Bone"
     Fed ID    54-2186274
               EIN

2038-4-10.3(EXECUTION) /121405

**EXHIBIT 2**

## ASSET PURCHASE AGREEMENT

This Asset Purchase and Sale Agreement (the "Agreement"), is made and entered into this 17th day of May, 2016, by and between Structured Asset Sales, LLC, a Nevada limited liability company (the "Buyer") and David Seror, as the Chapter 7 Trustee (the "Trustee" or the "Seller") for the bankruptcy estate (the "Estate") of Anthony Henderson aka Krayzie Bone dba Bone Thugs n Harmony (the "Debtor") (collectively, with the Seller, the "Parties", and each individually, a "Party").

## RECITALS

WHEREAS, on September 7, 2010 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division (the "Bankruptcy Court"), initiating the Chapter 7 bankruptcy case identified as In re Anthony Henderson aka Krayzie Bone dba Bone Thugs n Harmony, Case No. 1:10-bk-21216-MT (the "Bankruptcy Case").

WHEREAS, upon the terms, and subject to the conditions, set forth herein and pursuant to Section 363 of the Bankruptcy Code, the Seller desires to sell, transfer, convey, assign and deliver to the Buyer, and the Buyer desires to purchase and accept from the Seller, the Purchased Assets (as defined below) as contemplated herein.

NOW, THEREFORE, in consideration of the mutual promises and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, agree as follows:

## SECTION 1- RECITALS INCORPORATED IN AGREEMENT

1.1.  The above recitals are hereby incorporated herein by reference.

## SECTION 2 – DEFINITIONS

2.1.    "Claim" shall have the meaning ascribed to it in 11 U.S.C. § 101(5).

2.2.    "Contemplated Transactions" means the purchase and sale of the Purchased Assets and all other transactions contemplated by the Transaction Documents.

2.3.    "Effective Date" means the date the Sale Order (as hereinbelow defined) becomes a final, non-appealable order.

2.4.    "Government Entity" means any federal, state, local or foreign court, administrative body or other governmental entity with competent jurisdiction.

2.5.    "Law" means any law, decree, ordinance, regulation, rule, code or rule of common law, or otherwise of any Government Entity.

D-318507

## EXHIBIT "1"

2.6.    "Lien" means any lien, claim, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

2.7.    "Transaction Documents" means this Agreement and any amendments thereto, including any schedules or exhibits hereto and any agreements, instruments, certificates or other documents executed and delivered in connection herewith.

## SECTION 3 – TERMS OF PURCHASE AND SALE

3.1.  Transfer of Assets.

      3.1.1.    Purchase and Sale of Purchased Assets.    On the terms, and subject to the conditions and other provisions set forth in this Agreement, the Seller shall sell, assign, transfer, convey and deliver to the Buyer, free and clear of all Claims and Liens, and the Buyer shall purchase, acquire and accept from the Seller, all of the Estate's right, title and interest in, to, and under the certain assets (collectively, the "Purchased Assets") as follows:

           3.1.1.1.    The Estate's rights to (i) any and all future royalty payments, and payments of any kind, paid after June 30, 2016, no matter when earned; (ii) audit rights and copyright infringement rights; and (iii) any and all contract rights and claims, if any, arising out of the Debtor's intellectual property, including but not limited to all musical compositions, works and songs, written in full and/or part or performed in whole and/or part by the Debtor, whether scheduled or unscheduled, if any, including but not limited to the intellectual property identified on **Schedule "A"** to the Agreement, to the extent the Estate has any right, title or interest in the items listed on **Schedule "A"**, which is not warranted by the Seller;

           3.1.1.2.    The Estate's rights to any of the Debtor's intellectual property, including but not limited to all musical compositions, works and songs, written in full and/or part or performed in whole and/or part by the Debtor, whether scheduled or unscheduled, if any, including but not limited to the intellectual property identified on **Schedule "A"** to the Agreement, to the extent the Estate has any right, title or interest in the items listed on **Schedule "A"**, which is not warranted by the Seller;

           3.1.1.3.    The royalty payments and payments referred to in Section 3.1.1.1 herein shall include, but not be limited to, the following:

Artist royalties, record royalties, producer royalties, trademark income and/or royalties, name and likeness income and/or royalties, merchandising income and/or royalties, trademark income and/or royalties, logo income and/or royalties, producer and record master income and royalties of any kind, and payments of any kind, including performance income, mechanical license income, synchronization license income, printed music royalty income, digital royalties, electronic royalties, streaming royalties, all income from known mediums and mediums to be created, bonuses and other one-time

payments, and all other payments, all contract rights, claims, audit rights, copyright infringement rights, and any all rights, from any and all publishers, sub-publishers, administrators, record companies, artists, songwriter(s), performers, collection societies, and any source of income or payor including, but not limited to: the American Society of Composers and Publishers ("ASCAP"), the Society of European Stage Authors and Composers ("SESAC"), Broadcast Music, Inc. ("BMI"), Rondor Music International, Universal Music Publishing, Chamillitary, Dynatone Publishing Co, Gimme Minz Publishing, Songs Of Universal Inc., Almo Music Corp., EMI, Sony/ATV Songs, LLC, Keenu Songs, E Forty Music Publishing Company, and any Universal related entity ("Universal"), Tefnoise Publishing, JTC Atlantic Publishing, Marlowe Music, Stone Diamond Music Corporation, Baby Ree Toonz, Inc, T Funk Music, Struggling Publishing, Dj Hi Tek Music Publishing, Rubber Band Music, Nappy Boy Lyriq, Songs of Windswept Pacific, Songs of QD3, Femi Music, EMI Blackwood Music Inc., Songs of Universal Inc, Jahmen Music, Screen Gem- EMI Music Inc., LCM Deep South Music Publishing, SoundExchange, Inc., PRS, Phonographic Performance Ltd ("PPL"), MCPS, The Harry Fox Agency, Inc., HFA, and any related Harry Fox entity ("Harry Fox"), CMRRA, SOCAN, to, and any sub-publisher, administrator, any record company but not limited to Universal and Universal related entity ("Universal"), Chamillitary and any related entity, any record company music service company, likeness and publicity and/or trademark licensor and/or company and any record company and/or third party payor of any income and/or royalties or societies worldwide and throughout the universe and any related entity or entities and any payment of any kind.

3.1.1.3.    The sale of the Purchased Assets does not include the Trustee's recoveries, payments from, and/or proceeds from the Purchased Assets received by the Trustee prior to entry of the Sale Order (as defined below) (the "Excluded Assets"); and

3.1.1.4.    The sale of the Purchased Assets shall be on an "as is, where is" basis, without any warranty expressed or implied.

3.1.2.    Instruments of Transfer.    The sale, assignment, transfer, and conveyance of the Purchased Assets to the Buyer shall be made by an assignment in the form attached to this Agreement as **Exhibit "B"**, bills of sale, other instruments of assignment, transfer and conveyance provided for in Section 6 below, and such other instruments as may reasonably be requested by the Buyer to transfer, convey, and assign the Purchased Assets to the Buyer.

3.2.    Payment of Purchase Price.    Upon the terms, and subject to the conditions contained in this Agreement, the Seller agrees to sell, transfer, and assign all of its right, title and interest in the Purchased Assets to the Buyer free and clear of all liens, claims, encumbrances and interests subject to approval of the Bankruptcy Court, for the total consideration of $44,897.05, or such other sum as the Buyer agrees to pay as a result of any overbid that may occur at the Auction (as defined below) as hereinafter provided (the "Purchase Price").    Within five (5) days of full execution of this Agreement, the Buyer shall pay $44,897.05 to the Seller by wire transfer of immediately available funds to the account specified by the Seller (the "Initial Payment").    To the extent that there is overbidding and the Buyer is the Successful Bidder (as defined below),

such that the Purchase Price exceeds the Initial Payment, the Buyer will immediately provide the difference (the "Final Payment") to the Seller upon the close of the Auction by check.

3.3. Bankruptcy Court Approval. Following receipt of a fully executed copy of this Agreement, the Seller will file a motion in the Bankruptcy Case, pursuant to which the Seller will seek orders of the Bankruptcy Court (i) establishing overbid and other sale procedures (the "Sale Procedures,", as further described in Section 8 herein) and (ii) approving the sale of the Purchased Assets contemplated by this Agreement, in a form and substance satisfactory to the Buyer or other Successful Bidder, approving the asset sale under 11 U.S.C. § 363(b) and (f) free and clear of all liens, claims, encumbrances and interests, and finding, among other things, that Buyer or other Successful Bidder is a good faith purchaser entitled to the protections of 11 U.S.C. §363(m) and that all parties in interest have been properly served and notified of the sale (the "Sale Order").

3.4.    No Assumption of Obligations or Liabilities. Upon the later of (i) full execution of this Agreement; and (ii) approval of the sale subject to the terms of this Agreement by the Bankruptcy Court, the Buyer shall assume all obligations and liabilities relating to the Purchased Assets but shall not assume, or in any way become liable for, any other obligation or liability of the Seller independent of the Purchased Assets.

3.5. Payment Liability. Each Party will bear its own taxes in connection with this Agreement and the transactions contemplated hereby, and the Seller will pay all sales, use, or transfer taxes and fees lawfully imposed by any governmental agency or any other party entitled to receive payment as a result of the transactions hereunder, whether at or after closing hereunder, in connection with the transfer of the Purchased Assets hereunder.

**SECTION 4 – REPRESENTATIONS AND WARRANTIES OF SELLER**

4. The Seller represents and warrants to the Buyer as follows:

4.1.    Authorization. Subject to the authority of the Bankruptcy Court and the provisions of the Bankruptcy Code, the Seller has all requisite power and authority to execute and deliver this Agreement, and to perform the transactions contemplated hereby.

4.2.    Due Execution; Validly Binding Agreement. This Agreement has been duly authorized, executed and delivered and constitutes a legal, valid, and binding obligation of the Seller, enforceable against him in accordance with its terms as approved by the Bankruptcy Court and is valid only if authorized by the Bankruptcy Court.

4.3.    Disclaimers; No Representations or Warranties. Except as provided in this Section 4, the Seller expressly disclaims and does not make any warranties, guaranties, promises, or representations of any kind whatsoever regarding the Purchased Assets, including but not limited to the value of the Purchased Assets and, without limitation, the compliance of any person or entity other than the Seller with this Agreement, the corresponding Sale Order, and/or other order(s) of the Bankruptcy Court.

## SECTION 5 – REPRESENTATIONS AND WARRANTIES OF BUYER

5. The Buyer represents and warrants to the Seller as follows:

    5.1.   Organization.  The Buyer is a Nevada Limited Liability Corporation, validly existing and in good standing under the laws of the State of Nevada.

    5.2.   Authorization.  The Buyer has the requisite power and authority to purchase the Purchased Assets from the Seller, execute and deliver this Agreement, and to perform the transactions contemplated hereby or thereby.

    5.3.   Due Execution; Validly Binding.  This Agreement has been duly authorized, executed and delivered and constitutes a legal, valid, and binding obligation of the Buyer, enforceable against it in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditor' rights in general and subject to general principles of equity.

    5.4.   No Litigation. The Buyer has no actual knowledge of any known suit, action, litigation or other proceeding or governmental or administrative investigation or inquiry, pending or threatened, against the Buyer that could prevent or prohibit the Buyer from purchasing the Purchased Assets or from otherwise complying in full with the provisions of this Agreement. Transfer of the Purchased Assets pursuant to this Agreement will not breach, violate or otherwise contravene any applicable law, statute, regulation or contractual term.

## SECTION 6 – CLOSE OF SALE

6.1   Conditions to Closing.

    6.1.1.   Conditions to the Seller's Obligations.  The obligation of the Seller to effect the Closing is subject to the satisfaction or waiver prior to the Closing (as defined below) of each of the following conditions:

        6.1.1.1.    The Buyer or other Successful Bidder shall have performed and complied with, in all material respects, each and every covenant or other obligation required to be performed by it prior to the Closing.

        6.1.1.2.    Each of the representations and warranties made by the Buyer or other Successful Bidder in this Agreement shall have been accurate in all material respects as of the date of this Agreement, and shall be accurate in all material respects as of the Closing Date as if made on the Closing Date.

        6.1.1.3.    The Buyer or other Successful Bidder shall have paid or delivered all items required under Sections 3 and 6 to be paid or delivered by the Buyer on or before the Closing, including but not limited to the Initial Payment and any Final Payment (if the Successful Bidder is the Buyer) or the Initial Overbid (as defined below) and any Final Bid Payment (as defined below) (if the Successful Bidder is someone other than the Buyer).

6.1.1.4.        The Bankruptcy Court shall have entered the Sale Order.

6.1.1.5.        The Bankruptcy Case shall not have been dismissed.

6.1.1.6.        There shall be no injunction or court order restraining consummation of the Contemplated Transactions and there shall not have been adopted any Law making all or any portion of the Contemplated Transactions illegal.

6.1.1.7.        All consents, approvals and authorizations required to be obtained from, and all notices or applications required to be given or submitted to or filed with, any Government Entity shall have been obtained.

6.1.2.    Conditions to the Buyer's Obligations.    The obligation of the Buyer to effect the Closing is subject to the satisfaction or waiver prior to the Closing of each of the following conditions:

6.1.2.1.        The Seller shall have performed and complied with, in all material respects, each and every covenant or other obligation required to be performed by it hereunder prior to the Closing.

6.1.2.2.        Each of the recitals made by the Seller in this Agreement shall have been accurate in all material respects as of the date of this Agreement, and shall be accurate in all material respects as of the Closing Date as if made on the Closing Date.

6.1.2.3.        The Seller shall have delivered all items required under Sections 3 and 6 to be delivered by the Seller on or before the Closing.

6.1.2.4.        The Bankruptcy Court shall have entered the Sale Order.

6.1.2.5.        The Bankruptcy Case shall not have been dismissed.

6.2.    Closing.    The closing of the purchase and sale of the Purchased Assets under this Agreement (the "Closing") shall take place at the offices of Brutzkus Gubner LLP, 21650 Oxnard Street, Suite 500, Woodland Hills, CA 91367.  The Closing shall be held on the Effective Date subject to the satisfaction or waiver of all conditions precedent to the parties' obligations hereunder, or on such other date as my be mutually agreed upon by the parties hereto (the "Closing Date").  All actions to be taken at the Closing pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

6.3.    Closing Deliveries.

6.3.1.    Seller's Deliveries to Buyer at Closing.    On the Closing Date, the Seller shall deliver any such documents or things (both originals and emailed scans of originals) reasonably contemplated by this Agreement to be delivered by the Seller to the Buyer at the Closing.

6

**34**

6.4.    <u>Obligations After Closing</u>.  Following the Closing, the Seller and the Buyer shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, such instruments and take such other actions as may be necessary or advisable to carry out their obligations under the Transaction Documents and any other document, certificate or other instrument required by Law.

## SECTION 7 - TERMINATION

7.1.    This Agreement may be terminated at any time prior to the Closing:

7.1.1.  upon written notice from the Seller to the Buyer, if the Closing shall not have occurred prior to the transmission of such written notice;

7.1.2.  by mutual written consent of the Seller and the Buyer;

7.1.3.  by the Seller, if the Buyer shall have breached or failed to perform any of its representations, warranties, covenants or agreements set forth in this Agreement, or if any representation or warranty of the Buyer shall have become untrue, in either case such that the conditions set forth in Section 6.1.1 would not be satisfied and such breach or termination event is incapable of being cured or, if capable of being cured, shall not have been cured within ten (10) days following receipt by the Buyer of notice of such breach or termination event from the Seller; or

7.1.4.  by written notice from the Seller to the Buyer in the event any of the conditions precedent set forth in Section 6 shall become incapable of being satisfied other than as a result of the Seller's breach of any of its representations, warranties or covenants under this Agreement.

7.2.    In the event of valid termination of this Agreement pursuant to Section 7.1, this Agreement shall thereupon terminate and become void and have no effect, and the Contemplated Transactions shall be abandoned without further action by the Parties hereto, except for the provisions of Section 9, which shall survive.  Nothing in this Section 7.2 shall relieve the Buyer or the Seller of any liability for a breach of this Agreement prior to the effective date of such termination.  In the event of termination of this Agreement due to breach by the Buyer, the Seller shall be entitled to retain $9,000.00 of the Purchase Price as liquidated damages.  In the event of other termination of the Agreement, the Purchase Price shall be returned to the Buyer within fifteen (15) business days of termination.

## SECTION 8 – SALE PROCEDURES

8.    <u>Sale Procedures and Break Up Fee / Expense Reimbursement</u>.  The Seller will implement the following Sale Procedures, upon approval of such Sale Procedures pursuant to the Sale Motion (as defined below), seeking to obtain higher and better offers for the Purchased Assets:

8.1.    The Seller will accept bids with an initial overbid that must be in an amount of at least $50,000 (the "<u>Initial Overbid</u>").  Any such Initial Overbid(s) must be received by the Seller

7

in certified funds no later than 4:00 p.m. PST on August 15, 2016 by the Seller at 21650 Oxnard Street, Suite 500, Woodland Hills, California 91367.

8.2.    In the event that the Seller receives any Initial Overbids, an auction will be held at 11:00 a.m. PST on August 17, 2016 in Courtroom 302 of the United States Bankruptcy Court located at 21041 Burbank Boulevard, Woodland Hills, California 91367 (the "Auction").

8.3.    In the event that an Auction is held, the highest Initial Overbid shall be the starting bid at the Auction (the "Starting Bid"). Any successive bids (after the Starting Bid) must be in increments of at least $2,500.00. Only the Proposed Purchaser and any party timely submitting an Initial Overbid shall be entitled to participate in the Auction.

8.4.    The bidder making the highest and best offer which is accepted by the Seller (the "Successful Bidder") shall be obligated to enter into this Agreement without modification and under the same terms and conditions as the Buyer, excepting the Purchase Price.

8.5.    In the event that the Buyer is not the Successful Bidder, and the Purchase Price is greater than the Initial Overbid submitted by the Successful Bidder, the Successful Bidder shall immediately remit to the Seller the difference between their Initial Overbid and the Purchase Price (the "Final Overbid Payment") at the closing of the Auction

8.6.    In the event that the Buyer is not the Successful Bidder, then the Buyer shall be entitled to a break-up fee/expense reimbursement in the amount of $4,489.71 (the "Expense Reimbursement").

8.7.    After the Closing, the Seller shall return any payments made by any bidders other than the Successful Bidder.

8.8.    The hearing on the motion to approve this Agreement (the "Sale Motion") shall be set on notice as soon as practical (the "Sale Hearing"). At the Sale Hearing, the Seller will request that the Bankruptcy Court (i) grant the Sale Motion, (ii) authorize the Seller to sell the Purchased Assets to the Successful Bidder on the terms and conditions herein set forth, excepting only the Purchase Price, and (iii) if such bidder is other than the Buyer, approve and authorize the payment of the Expense Reimbursement to the Buyer.

8.9.    In the event that the Successful Bidder is unable to perform its obligations under this Agreement or otherwise breaches or terminates this Agreement, then the next highest bidder (the "Backup Bidder") shall become the Successful Bidder and be obligated to purchase the Purchased Assets according the terms and conditions in this Agreement. In the event that the Backup Bidder is unable to perform its obligations under this Agreement or otherwise breaches or terminates this Agreement, then the next highest bidder shall become obligated to purchase the Purchased Assets according to the terms and conditions in this Agreement, and so on.

8

## SECTION 9 - MISCELLANEOUS.

9.1.    Notices.  All notices hereunder shall be in writing and shall be deemed to have been duly given if (i) delivered personally, (ii) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, (iii) sent by reputable next-day or overnight mail or courier; (iv) sent by facsimile transmission; or (v) sent by electronic mail which requests a "read" receipt.  All such notices shall be deemed to have been received (A) if by personal delivery, upon delivery, (B) if by certified or registered mail, on the third (3rd) business day after the mailing thereof, (C) if by next-day or overnight mail or courier, on the business day after such mailing; (D) if by facsimile, three (3) hours after the sender receives a facsimile confirmation, unless the facsimile is sent after 5:00 p.m. PST on a business day or is sent on a non-business day, in which case it shall be deemed received on the next business day; and (E) if by electronic mail, upon the sender's receipt of the recipient's "read" receipt.  The address at which any Party hereto is to receive notice may be changed from time to time by such Party by giving notice of the new address to all other Parties hereto.  The addresses of the Parties, until changed in accordance with the foregoing, are:

<table>
<tr><td>Seller:</td><td>David Seror, Chapter 7 Trustee<br>C/O Brutzkus Gubner, LLP<br>Attn: Richard Burstein<br>21650 Oxnard Street, Suite 500<br>Woodland Hills, CA 91367<br>Fax: 818-827-9099<br>Email: rburstein@brutzkusgubner.com</td></tr>
<tr><td>Buyer:</td><td>Structured Asset Sales, LLC<br>Attn: David Pullman<br>2215-B Renaissance Drive, Suite 5<br>Las Vegas, NV 89119<br>Fax: 310-288-0908<br>Email: dpullman@pullmanbonds.com</td></tr>
</table>

9.2.    Amendment.  This Agreement may not be amended, modified or supplemented except by a written instrument duly executed by the Parties hereto and, where required, approved by the Bankruptcy Court.

9.3.    Interpretation.   Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

9.3.1.  Captions, titles or headings in this Agreement are for convenience of reference only and shall not affect, or be utilized in, construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

9.3.2.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

9.3.3.  The exhibits and schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  All exhibits and schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any schedule or exhibit but not otherwise defined herein shall be defined as set forth in this Agreement.

9.4.    Entire Agreement.  This Agreement and the other Transaction Documents (including any schedules or exhibits hereto and thereto) contain the entire understanding and agreement between the Parties with respect to the subject matter hereof.

9.5    Binding Effect; Third Party Beneficiaries.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and, except as otherwise prohibited, their respective heirs, personal representatives, successors and assigns.  Nothing contained in this Agreement, or implied herefrom, is intended to create any third person beneficiaries.

9.6.    Assignment.  Neither the Buyer nor the Seller may assign all or any portion of their respective rights or delegate any portion of their duties hereunder without the consent of the other Party hereto.

9.7.    Severability.  If a court of competent jurisdiction determines that any provision of this Agreement is void, illegal or unenforceable, the other provisions of this Agreement shall remain in full force and effect and the provisions that are determined to be void, illegal or unenforceable shall be limited so that they shall remain in effect to the extent permissible by Law.

9.8.    No Survival of Representations and Warranties.  All representations and warranties of the Parties contained in this Agreement shall terminate immediately after Closing and shall be of no further force and effect.

9.9.    Counterparts; Electronic Signatures.  This Agreement may be executed in one or more counterparts, each of which will be deemed an original, and all of which will constitute one and the same Agreement.  Facsimile signatures or signatures delivered by email in .pdf or similar format will be deemed original signatures for purposes of this Agreement.

[continued on following page]

9.10. <u>Governing Law</u>. THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE SUBSTANTIVE LAWS OF THE STATE OF CALIFORNIA AND APPLICABLE BANKRUPTCY LAW, WITHOUT GIVING EFFECT TO ANY CONFLICTS OF LAW RULE OR PRINCIPLE THAT MIGHT RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION. ALL DISPUTES WILL BE RESOLVED BY THE BANKRUPTCY COURT HAVING JURISDICTION OVER THE ESTATE OF THE DEBTOR.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above.

SELLER:

DAVID SEROR IN HIS CAPACITY AS
CHAPTER 7 TRUSTEE OF THE
BANKRUPTCY ESTATE OF ANTHONY
HENDERSON AKA KRAYZIE BONE
DBA BONE THUGS N HARMONY

By: _____
Name: David Seror
Title: Chapter 7 Trustee for the Bankruptcy
       Estate of Anthony Henderson aka
       Krayzie Bone dba Bone Thugs n
       Harmony


BUYER:

STRUCTURED ASSET SALES, LLC

By: _____ 6/30/16
Name: David Pullman
Title: Chief Executive Officer

11

**39**

SONGWRITER/COMPOSER

# HENDERSON ANTHONY

CURRENT AFFILIATION: ASCAP CAE/IPI #: 337563351
There are 184 Work Titles

<<First <Previous    1 2 3 4 5 6 7 8    Next> Last>>

| # | Work Title | BMI Work # |
|---|---|---|
| 1. | 2 GLOCK S U NEEK S REMIX | 12275610 |
| 2. | AINT SPENDIN NUTHIN | 8139006 |
| 3. | ALL EYES ON YOU | 20566896 |
| 4. | ALL GOOD | 4670800 |
| 5. | ALL ORIGINAL | 12273911 |
| 6. | ALL THE WAY | 12273914 |
| 7. | APPROACH 2 DANGER | 19906125 |
| 8. | ARTILLERY SHOP | 2087486 |
| 9. | BLAZE IT | 4465226 |
| 10. | BODY ROTT | 4583603 |
| 11. | BONE BONE BONE | 12274100 |
| 12. | BOYFRIEND GIRLFRIEND | 5539247 |
| 13. | BUDDAH LOVAZ | 2106192 |
| 14. | BUDSMOKERS ONLY | 7579353 |
| 15. | C TOWN | 11125579 |
| 16. | CAN T GIVE IT UP | 5703452 |
| 17. | CAN T GIVE IT UP ROCK REMIX | 14588858 |
| 18. | CAN T HUSTLE 4 EVER | 5692868 |
| 19. | CASH RULEZ | 14481320 |

**SCHEDULE A**    **40**

| 20. | CELEBRATION | 14855916 |
| 21. | CHANGE THE WORLD U NEEK S REMIX | 12274161 |
| 22. | CLOG UP YO MIND | 12274195 |
| 23. | COMPLICATED | 7579902 |
| 24. | CREEPIN ON AH COME UP | 1927418 |
| 25. | CREPT AND WE CAME | 2106191 |

<<First <Previous    1 2 3 4 5 6 7 8    Next> Last>>

**SCHEDULE A**                          41

SONGWRITER/COMPOSER

# HENDERSON ANTHONY

CURRENT AFFILIATION: ASCAP CAE/IPI #: 337563351
There are 184 Work Titles

<<First <Previous    1 2 3 4 5 6 7 8    Next> Last>>

| # | Work Title | BMI Work # |
|---|---|---|
| 26. | CRIBS-BG CUES | 0 |
| 27. | CROSSROAD | 2106190 |
| 28. | CUZ I M EASY | 2087443 |
| 29. | DA INTRODUCTION | 2162211 |
| 30. | DA THUGS | 5725218 |
| 31. | DESTROY YOU | 15160391 |
| 32. | DGIFU | 19291495 |
| 33. | DIARY ON MTV-BG CUES | 0 |
| 34. | DO IT AGAIN | 8578297 |
| 35. | DO YOUR THANG | 7775645 |
| 36. | DON T WORRY | 12274303 |
| 37. | DOWN 71 THE GETAWAY | 2106184 |
| 38. | DRAMA | 4765083 |
| 39. | EAST 1999 | 2106187 |
| 40. | ECSTACY | 12274318 |
| 41. | ETERNAL | 2106188 |
| 42. | EVERYDAY THANG | 2087516 |
| 43. | EVERYDAY THUGS | 12274383 |
| 44. | EVERYTIME | 11999299 |

**SCHEDULE A**

**42**

| 45. | EVIL PARADISE | 12274385 |
| 46. | FACTS DON T LIE | 11999319 |
| 47. | FAMILY TREE | 4266237 |
| 48. | FOE THA LOVE OF | 15720338 |
| 49. | FOR THE LOVE OF MONEY | 433982 |
| 50. | FRIED DAY | 5067491 |

<<First <Previous   1 2 3 4 5 6 7 8   Next> Last>>

## SCHEDULE A                    43

Exhibit "A"

# KRAYZIE BONE

There are 40 Work Titles

<<First <Previous    1 2    Next> Last>>

| # | Work Title | BMI Work # |
|---|------------|------------|
| 1. | AINT SPENDIN NUTHIN | 8139006 |
| 2. | CAN T HUSTLE 4 EVER | 5692868 |
| 3. | CLIMBING | 21154442 |
| 4. | DA THUGS | 5725218 |
| 5. | DRAMA | 4765083 |
| 6. | EASY RIDIN | 13429367 |
| 7. | GEMINI | 5897939 |
| 8. | HARD TIME HUSTLIN | 5761192 |
| 9. | I BEEN AROUND | 13542810 |
| 10. | I DON T KNOW WHAT | 5764627 |
| 11. | INTRO THUG INVASION | 5177889 |
| 12. | JACK MOVE | 12929885 |
| 13. | KRAYZIE BONE AINT NO LUV | 12259942 |
| 14. | KRAYZIE BONE TIL MY MONEY RIGHT | 12758354 |
| 15. | LOCK DOWN LOVE | 8016465 |
| 16. | LOOK AT YOU NOW | 5177890 |
| 17. | MIDWEST CHOPPERS 2 | 10791760 |
| 18. | MIDWEST NVASION | 16281670 |

**SCHEDULE A**

**44**

| 19. | MURDA WON T STOP | 5177891 |
| 20. | OHIO PLAYERS | 18059709 |
| 21. | PAYBACK IZ A BITCH | 5086991 |
| 22. | RELAY THUG LINE | 4904839 |
| 23. | RIDE FOR ME | 21167083 |
| 24. | RIDE IF YOU LIKE | 5897960 |
| 25. | RIDE THE THUG LINE | 6360963 |

<<First <Previous   1 2   Next> Last>>

# SCHEDULE A

45

SONGWRITER/COMPOSER

# HENDERSON ANTHONY

CURRENT AFFILIATION: ASCAP CAE/IPI #: 337563351
There are 184 Work Titles

<<First <Previous    1 2 3 4 5 6 7 8    Next> Last>>

| # | Work Title | BMI Work # |
|------|------------|------------|
| 51. | GANGSTA STREET | 2087496 |
| 52. | GEMINI | 5897939 |
| 53. | GHETTO | 4596671 |
| 54. | GHETTO COWBOY | 4660272 |
| 55. | GONNA TELL EVERYBODY | 8349530 |
| 56. | GOOD TIMES | 4772526 |
| 57. | GUN BLAST | 14138878 |
| 58. | HANDLE THE VIBE | 8986993 |
| 59. | HARD TIME HUSTLIN | 5761192 |
| 60. | HARD TIMES | 12274549 |
| 61. | HARD TIMES INTERLUDE | 4777864 |
| 62. | HATIN NATION | 12274553 |
| 63. | HIGH SCHOOL STORIES-BG CUES | 0 |
| 64. | HIP HOP BABY | 7579905 |
| 65. | HIT THE BLOCK | 9747261 |
| 66. | HOOK IT UP | 4566276 |
| 67. | HOW MANY OF US HAVE THEM | 14588725 |
| 68. | I BEEN AROUND | 13542810 |
| 69. | I CAN T TAKE IT NO MORE | 9864127 |

**SCHEDULE A**     **46**

| 70. | I DON T GIVE A FUCK | 6263789 |
| 71. | I DON T KNOW WHAT | 5764627 |
| 72. | I TRIED | 8966565 |
| 73. | I WANT CHA LOVIN | 12274621 |
| 74. | IF I COULD TEACH THE WORLD REMIX | 20403203 |
| 75. | IF I FALL | 12274636 |

<<First <Previous   1 2 3 4 5 6 7 8   Next> Last>>

**SCHEDULE A**                                    47

SONGWRITER/COMPOSER

# HENDERSON ANTHONY

CURRENT AFFILIATION: ASCAP CAE/IPI #: 337563351
There are 184 Work Titles

<<First <Previous   1 2 3 4 5 6 7 8   Next> Last>>

| # | Work Title | BMI Work # |
|---|---|---|
| 76. | IF THEY ONLY KNEW | 5806577 |
| 77. | IMPOSSIBLE | 9574366 |
| 78. | IN MEMORY OF EAZY | 19923615 |
| 79. | INTRO | 1927424 |
| 80. | INTRO THUG INVASION | 5177889 |
| 81. | IS IT ME | 5539249 |
| 82. | IST OF THA MONTH | 4170522 |
| 83. | IT S ALL MO THUG | 4866531 |
| 84. | IT S ALL REAL | 12274691 |
| 85. | IT WILL BE ALRIGHT | 19923599 |
| 86. | JUST VIBE MEDLEY | 8429766 |
| 87. | LAND OF THE HEARTLESS ORIGINAL | 2087429 |
| 88. | LET S ALL GET HIGH | 3822952 |
| 89. | LET THE LAW END | 12274778 |
| 90. | LISTEN TO YOUR HEART | 8320326 |
| 91. | LOCK AND LOAD | 8385139 |
| 92. | LOOK AT YOU NOW | 5177890 |
| 93. | LOOK INTO MY EYES | 4016513 |
| 94. | LOOK INTO MY EYES AT | 9163707 |

**SCHEDULE A**  **48**

| 95.  | LORD                   | 17916710 |
| 96.  | LORD WHAT HAVE I DONE  | 5539248  |
| 97.  | M O G                  | 8380567  |
| 98.  | ME KILLA               | 12274863 |
| 99.  | MEET ME IN THE SKY     | 12000567 |
| 100. | MO MURDA               | 2106185  |

<<First <Previous   1 2 3 4 5 6 7 8   Next> Last>>

**SCHEDULE A**                                    **49**

SONGWRITER/COMPOSER

# HENDERSON ANTHONY

CURRENT AFFILIATION: ASCAP  CAE/IPI #: 337563351
There are 184 Work Titles

<<First <Previous    1 2 3 4 5 6 7 8    Next> Last>>

| # | Work Title | BMI Work # |
|---|---|---|
| 101. | MO THUG | 12274890 |
| 102. | MO THUG FAMILY TREE | 12274891 |
| 103. | MOE CHEESE | 1927422 |
| 104. | MONEY MONEY | 6260835 |
| 105. | MORE THAN THUGS | 21686387 |
| 106. | MR BILL COLLECTOR | 2106189 |
| 107. | MR OUIJA 2 | 12274922 |
| 108. | MURDA WON T STOP | 5177891 |
| 109. | MURDER ON THE GOVERNMENT | 8385516 |
| 110. | MURDER ONE | 12274930 |
| 111. | MY STREET BLUES | 15854421 |
| 112. | NEED YOUR BODY | 7579906 |
| 113. | NEIGHBOURHOOD SLANG | 12274949 |
| 114. | NEVER FORGET ME | 8934438 |
| 115. | NEVER LET YOU DOWN | 8397743 |
| 116. | NIGGAZ KNOW | 16432657 |
| 117. | NINE MM | 9205041 |
| 118. | NO SHORTS NO LOSSES | 11721165 |
| 119. | NO SURRENDER | 1927412 |

**SCHEDULE A**

**50**

| 120. | NOT MY BABY | 6234852 |
| 121. | OHIO PLAYERS | 18059709 |
| 122. | ONLY GOD CAN JUDGE ME | 12000945 |
| 123. | ORDER MY STEPS DEAR LORD | 8939026 |
| 124. | P O D | 12275027 |
| 125. | PAY 4 IT | 18274366 |

<<First <Previous    1 2 3 4 5 6 7 8    Next> Last>>

**SCHEDULE A**                                        51

SONGWRITER/COMPOSER

# HENDERSON ANTHONY

CURRENT AFFILIATION: ASCAP CAE/IPI #: 337563351
There are 184 Work Titles

<<First <Previous   1 2 3 4 5 6 7 8   Next> Last>>

| # | Work Title | BMI Work # |
|---|---|---|
| 126. | PAY WHAT THEY OWE | 12001029 |
| 127. | PAYBACK IZ A BITCH | 5086991 |
| 128. | PLAYA HATER | 3879619 |
| 129. | PUPPET MASTERS | 8394060 |
| 130. | READY 4 WAR | 20403872 |
| 131. | REAL LIFE | 7579908 |
| 132. | RETALIATION | 12275154 |
| 133. | RETALIATION INTRO | 20403902 |
| 134. | RIDE FOR ME | 21167083 |
| 135. | RIDE IF YOU LIKE | 5897960 |
| 136. | RIDE THE THUG LINE | 6360963 |
| 137. | SEX 2K-BG CUES | 0 |
| 138. | SHACKLED UP | 17884135 |
| 139. | SHE GOT CRAZY | 10328652 |
| 140. | SHOOT EM UP | 3688558 |
| 141. | SHOTZ TO THA DOUBLE GLOCK | 2106186 |
| 142. | SLEEPWALKER | 2087512 |
| 143. | SMOKIN BUDDAH | 5318689 |
| 144. | SOCIAL HISTORY OF P | 0 |

**SCHEDULE A**                    **52**

| 145. | SOMETHING AIN T RIGHT | 13542814 |
| 146. | SOUNDS THE SAME | 9160473 |
| 147. | SPIT YOUR GAME | 8277793 |
| 148. | STR8 RIDAZ | 7579909 |
| 149. | STREETS | 8804424 |
| 150. | TAKE THE LEAD WANNA RIDE | 8511815 |

<<First <Previous    1 2 3 4 5 6 7 8    Next> Last>>

**SCHEDULE A**                    53

SONGWRITER/COMPOSER

# HENDERSON ANTHONY

CURRENT AFFILIATION: ASCAP CAE/IPI #: 337563351
There are 184 Work Titles

<<First <Previous    2 3 4 5 6 7 8    Next> Last>>

| # | Work Title | BMI Work # |
|------|------------|------------|
| 151. | THA LOVE OF MONEY | 1936919 |
| 152. | THEZE DAYZ | 5177886 |
| 153. | THIS AIN T A GAME | 8170064 |
| 154. | THUG ALWAYS | 4813768 |
| 155. | THUG LOVE | 4159725 |
| 156. | THUG ON DA LINE | 14543851 |
| 157. | THUGGISH RUGGISH BONE | 1927423 |
| 158. | THUGGISH RUGGISH BONE UNEEK S REMIX | 2043673 |
| 159. | TILL WE DEAD AND GONE | 4727017 |
| 160. | TRY ME | 4811665 |
| 161. | U AIN T BONE | 12275485 |
| 162. | ULTIMATE VIDEO GAME CO-BG CUES | 0 |
| 163. | UNCHAINED | 16346342 |
| 164. | UNI VERSE | 11443149 |
| 165. | UNTOUCHABLE SWIZZ BEATZ REMIX | 8565460 |
| 166. | VEGAS | 15854422 |
| 167. | WALK LIKE A WARRIOR | 6801190 |
| 168. | WARRIORS | 8385573 |
| 169. | WASTELAND WARRIORS | 12275530 |

**SCHEDULE A**

54

| 170. | WATCH HOW I DO THIS | 9724847 |
| 171. | WE COME TO SERVE EM REMIX | 12275539 |
| 172. | WE DONE TOLD THEM BOYS | 8385521 |
| 173. | WE STARVIN | 4878098 |
| 174. | WEED SONG | 11669313 |
| 175. | WHAT ABOUT US | 6542028 |

<<First <Previous    2 3 4 5 6 7 8    Next> Last>>

**SCHEDULE A**                                55

SONGWRITER/COMPOSER

# HENDERSON ANTHONY

CURRENT AFFILIATION: ASCAP CAE/IPI #: 337563351
There are 184 Work Titles

<<First <Previous   3 4 5 6 7 8   Next Last

| # | Work Title | BMI Work # |
|------|------------|------------|
| 176. | WHAT S FRIENDS | 7579910 |
| 177. | WHEN THE MUSIC STOP | 15266637 |
| 178. | WHEN THE MUSIC STOP DIRTY | 15266638 |
| 179. | WHERE MY THUGZ AT | 12275560 |
| 180. | WHOM DIE THEY LIE | 12275566 |
| 181. | WIND BLOW | 9283881 |
| 182. | WONDERFUL WORLD | 7849670 |
| 183. | WORLD SO CRUEL | 3899489 |
| 184. | Y ALL DON T KNOW ME | 5897940 |

<<First <Previous   3 4 5 6 7 8   Next Last

**SCHEDULE A**      56

# KRAYZIE BONE

There are 40 Work Titles

<<First <Previous     1 2     Next  Last

| #   | Work Title                 | BMI Work #  |
|-----|----------------------------|-------------|
| 26. | ROLLIN UP SOME MO          | 5756943     |
| 27. | SHACKLED UP                | 17884135    |
| 28. | SMOKIN BUDDAH              | 5318689     |
| 29. | SOMETHING AIN T RIGHT      | 13542814    |
| 30. | THEZE DAYZ                 | 5177886     |
| 31. | THUG ALWAYS                | 4813768     |
| 32. | THUG ON DA LINE            | 14543851    |
| 33. | TRY ME                     | 4811665     |
| 34. | WATCH HOW I DO THIS        | 9724847     |
| 35. | WE RIDIN                   | 11189620    |
| 36. | WE STARVIN                 | 4878098     |
| 37. | WHEN THE MUSIC STOP        | 15266637    |
| 38. | WHEN THE MUSIC STOP DIRTY  | 15266638    |
| 39. | WHERE MY THUGZ AT          | 12275560    |
| 40. | Y ALL DON T KNOW ME        | 5897940     |

<<First <Previous     1 2     Next  Last

**SCHEDULE A**                    57

| Year | Album |
|------|-------|
| 2015 | Chasing The Devil |
| 2015 | Chasing The Devil |
| 2015 | Chasing The Devil |
| 2011 | Under The Influence: The Fixtape Vol 4 |
| 2010 | The Fixtape: Lyrical Paraphernalia: Volume 3 |
| 2009 | Just One Mo Hit: The Fixtape Volume Two |
| 2009 | Just One Mo Hit: The Fixtape Volume Two |
| 2008 | The Fixtape Volume One: Smoke On This |
| 2007 | Thugline Boss |
| 2005 | Gemini: Good Vs. Evil |
| 2005 | Gemini: Good Vs. Evil |
| 2001 | Thug On Da Line |
| 2001 | Thug On Da Line |
| 1999 | Thug Mentality 1999 |
| 1999 | Thug Mentality 1999 |

## Billboard Singles

| Year | Single |
|------|--------|
| 1999 | Thug Mentality |
| 1997 | Life After Death |
| 1997 | Make Me Holla |
| 1997 | Mo Thugs Family Scriptures |
| 1997 | Trials & Tribulations |
| 1996 | T.H.U.G.S.: Trues Humbly United Gatherin' Souls |
|  | All Eyes on You |
|  | Cold Chilling-Compton |
|  | Heavy Beatz |
|  | Hip To The Hop |
|  | Hits of the Decade 2000-2009 |
|  | Release Di Truth, Vol. 1 |
|  | Untouchable [Swizz Beatz Remix] |

**SCHEDULE A**                                    58

## Credits

| Year | Album |
|------|-------|
| 2015 | Dreams Worth More Than Money |
| 2015 | E.S.P. (Erick Sermon's Perception) |
| 2013 | Let Me Explain |
| 2013 | Trap Lord |
| 2012 | DJ Explosion Box Set |
| 2012 | Django Unchained |
| 2012 | The Best of Blazin' Squad |
| 2011 | The Collection |
| 2010 | R&B Clubland |
| 2010 | The Essential "Weird Al" Yankovic: Limited Edition 3.0 |
| 2008 | Live! We Are Different |
| 2008 | Pineapple Express |
| 2007 | Grammy Statuz |
| 2007 | Hip Hop, Vol. 5: The Collection |
| 2007 | Hip Hop: The Collection, Vol. 5 |
| 2007 | Hits for Kids, Vol. 17 |
| 2007 | I Tried |
| 2007 | Just the Hits 2007 |
| 2007 | Lounge Tribute to Chamillionaire |
| 2007 | Strength & Loyalty |
| 2007 | Ultimate Victory |
| 2006 | A      Ridin |

| 2006 | 4 Seasonz |
| 2006 | Gangsta Party [Box Set] [Thump] |
| 2006 | Pac's Life |
| 2006 | Punk Life |
| 2006 | Rap It Up [Box Set] |
| 2006 | So Amazin' |
| 2006 | Spit Your Game/Hold Ya Head, Pt. 1 [Maxi Single] |
| 2006 | Straight Outta Lynwood |
| 2006 | Take the Lead (Wanna Ride) |
| 2006 | Take the Lead [Original Soundtrack] |
| 2006 | Untouchable |
| 2006 | Waist Deep |
| 2005 | Duets: The Final Chapter |
| 2005 | The Sound of Revenge |
| 2004 | Greatest Hits |
| 2004 | Greatest Video Hits [DVD] |
| 2004 | Tha Down Low |
| 2002 | Friday After Next |
| 2002 | In the Beginning |
| 2001 | West Coast Bad Boyz, Vol. 3: Poppin' Collars |
| 2000 | The Collection, Vol. 2 |
| 2000 | Thundadome |
| 1999 | Boom, Vol. 2 |
| 1999 | Ghetto Street Pharmacist |
| 1999 | Ghetty Green |
| 1999 | Next Friday [Original Motion Picture Soundtrack] |
| 1999 | SB1: Skiboarding Journey |
| 1999 | Thug Mentality 1999 |
| 1998 | Chapter II: Family Reunion |
| 1998 | Crucial Rap |
| 1998 | Crucial Rap, Vol. 1 |
| 1998 | The Shadiest One |
| 1997 | A New Breed of Female |

**SCHEDULE A**                                    60

## EXHIBIT B

## BILL OF SALE AND ASSIGNMENT

This Bill of Sale and Assignment (the "Assignment") is made effective as hereinabove defined in the Asset Purchase Agreement dated May 17, 2016 (the "Agreement") to which this Assignment is appended, by David Seror, as the Chapter 7 Trustee for the bankruptcy estate of Anthony Henderson aka Krayzie Bone dba Bone Thugs n Harmony (the "Assignor"), and Structured Asset Sales, LLC, a Nevada limited liability company (the "Assignee") (collectively, with the Assignor, the "Parties", and each individually, a "Party").

## RECITALS

A.    Pursuant to the provisions of the Agreement by and between the Assignee and the Assignor, the Assignor has agreed to assign to Assignee all right, title and interest in and to the Purchased Assets, as identified herein and on the annexed **Attachment "1"**.

B.    The Assignee desires to obtain all right, title and interest in the Purchased Assets according to the terms of this Assignment and the Agreement.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein and in the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Definitions.  Unless otherwise defined in this Assignment, capitalized terms appearing herein shall have the same meaning as in the Agreement.

2. Sale, Transfer, Assignment, Delivery and Conveyance.  Upon the terms, and subject to the conditions, of the Agreement, the Assignor does hereby absolutely, unconditionally, and irrevocably grant, sell, transfer, convey, and assign to the Assignee, and the Assignee does hereby purchase and accept from the Assignor, all of the Assignor's right, title, and interest in, to, and under, and all obligations under or relating to, the Purchased Assets, free and clear of liens.

3. Limitation of Representations.  This Agreement in no way defeats, limits, alters, impairs, enhances or enlarges any right, obligation, claim or remedy under the Agreement, including the rights the Parties may have under the representations, warranties, and indemnities set forth therein.  If any provision of this Agreement is construed to conflict with a provision of the Agreement, the provision in the Agreement shall be deemed controlling.

4. Counterparts.  This Assignment may be executed in any number of original, facsimile or portable document format (pdf) counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one instrument.

1

## EXHIBIT B

5. <u>Governing Law</u>. This Assignment will be governed by, and construed and interpreted in accordance with, the substantive laws of the state of California and applicable bankruptcy law, without giving effect to any conflicts of law rule or principle that might result in the application of the laws of another jurisdiction. All disputes will be resolved by the bankruptcy court having jurisdiction over the Estate of the Debtor.

6. <u>Binding Effect; Assignment</u>. This Assignment shall be binding upon, and inure to the benefit of, the Parties and their respective successors and permitted assigns. Nothing in this Assignment shall create, or be deemed to create, any third party beneficiary rights in any person or entity not a party to this Assignment. No assignment of the Agreement or of any rights or obligations thereunder may be made by either Party (by operation of law or otherwise) without the prior written consent of the other Party, and any attempted assignment without the required consents shall be void.

The Parties hereto have caused this Assignment to be duly executed by their respective authorized persons as of the dates identified below.

ASSIGNOR:

DAVID SEROR IN HIS CAPACITY AS
CHAPTER 7 TRUSTEE OF THE
BANKRUPTCY ESTATE OF ANTHONY
HENDERSON AKA KRAYZIE BONE
DBA BONE THUGS N HARMONY

By:    _____
Name: David Seror
Title:  Chapter 7 Trustee for the Bankruptcy
        Estate of Anthony Henderson aka
        Krayzie Bone dba Bone Thugs n
        Harmony

ASSIGNEE:

STRUCTURED ASSET SALES, LLC

By:    _____
Name: David Pullman
Title:  Chief Executive Officer

2
**EXHIBIT B**

**EXHIBIT 3**

STEVEN T. GUBNER **-** Bar No. 156593
RICHARD D. BURSTEIN **-** Bar No. 56661
NINA Z. JAVAN – Bar No. 271392
**BRUTZKUS GUBNER LLP**
21650 Oxnard Street, Suite 500
Woodland Hills, CA  91367
Telephone:  818.827.9000
Facsimile:  818.827.9099
Email:       sgubner@brutzkusgubner.com
                 rburstein@brutzkusgubner.com
                 njavan@brutzkusgubner.com

FILED & ENTERED

AUG 23 2016

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY **Fisher**      DEPUTY CLERK

Attorneys for David Seror, Chapter 7 Trustee

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | Case No. 1:10-bk-21216-MT |
| ANTHONY HENDERSON aka KRAYZIE BONE dba BONE THUGS N HARMONY, | Chapter 7 |
| Debtor. | **ORDER AUTHORIZING AND APPROVING SALE OF CERTAIN ESTATE ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS [11 U.S.C. § 363]** |
| | Hearing on Approval of Sale of Assets:<br>**Date:**  August 17, 2016<br>**Time:**  11:00 a.m.<br>**Place:**  Courtroom 302<br>             United States Bankruptcy Court<br>             21041 Burbank Boulevard<br>             Woodland Hills, CA 91367 |

The Court having considered the "Motion to Authorize and Approve the Sale of Certain of the Estate's Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests" (the "Motion", Dkt. No. 96), filed by David Seror, the Chapter 7 Trustee (the "Trustee") for the bankruptcy estate (the "Estate") of Anthony Henderson aka Krayzie Bone dba Bone Thugs n Harmony (the "Debtor"), whereby the Trustee sought an order approving, among other things,

-1-

**64**

1 the sale of the Purchased Assets (as defined in the Motion)[1] to Structured Asset Sales, LLC (the

2 "Purchaser") or the highest qualified overbidder (the "Sale"); and this Court having entered an

3 order on August 2, 2016 (the "Bid Procedures Order", Dkt. No. 101) approving, among other

4 things, the dates, deadlines, and procedures with respect to the Sale; having overruled the unfiled

5 objection of Alithia Perez (the "Objection"); a hearing having been held on August 17, 2016 (the

6 "Sale Hearing") to consider approval of the asset purchase agreement between the Trustee and

7 the Proposed Purchaser (the "APA") and the Sale; a public auction having been held at the Sale

8 Hearing, during which overbidder Currency Corp. (the "Overbidder") and the Purchaser

9 submitted multiple competing bids, with the highest bid received made by the Purchaser in the

10 amount of $157,500.00; adequate and sufficient notice of the Sale Motion and the Sale Hearing

11 having been given to all parties in interest; all parties having been afforded due process and an

12 opportunity to be heard with respect to the Sale Motion and all relief requested therein; the Court

13 having also reviewed and considered: (a) the Trustee's reply to the Objection (Dkt. No. 104) and

14 accompanying declarations and exhibits; and (b) the arguments and representations of counsel

15 and the Trustee at the Sale Hearing; and after due deliberation and sufficient cause appearing:

16      **IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

17   1. The Sale Motion is **GRANTED**.

18   2. Except as otherwise provided in this sale order (the "Sale Order"), any objections to the

19      Sale Motion or the entry of this Sale Order which have not been withdrawn, waived, or

20      settled, and all reservations of rights included therein, are hereby **DENIED** and

21      **OVERRULED**.

22   3. The sale of the Purchased Assets to Structured Asset Sales, LLC for the total amount of

23      $157,500.00 (the "Final Purchase Price") is approved.

24   4. Structured Asset Sales, LLC must remit $112,602.95 (the difference between the original

25      $44,897.05 proposed purchase price and the $157,500.00 Final Purchase Price) to the

26      Trustee in certified funds no later than five (5) calendar days from the Sale Hearing.

27

28

---

[1] Capitalized terms not otherwise defined herein shall have the same meaning as in the Sale Motion.

**65**

5. The APA, including all of its terms and conditions, is approved, subject to any modifications in this Sale Order.

6. The Sale shall be free and clear of any and all liens, claims, encumbrances, and interests pursuant to 11 U.S.C. §§ 363(b) and (f), including but not limited to those asserted by the Objection.

7. Any and all Claims and Liens, as such terms are defined in the Motion and/or the APA, asserted by any person and/or entity against the Purchased Assets shall attach to the net cash proceeds received by the Estate derived from the Sale in the same validity, force and effect that such Claim or Lien may have had against the Purchased Assets, subject to the rights and defenses, if any, held by the Trustee and the Estate.

8. The stay imposed by Federal Rule of Bankruptcy Procedure 6004(h) is waived.

9. The Purchaser is deemed to be a "good faith" purchaser for the purposes of 11 U.S.C. § 363(m) with respect to the Sale, and the Sale is not subject to avoidance under 11 U.S.C. § 363(n).

10. The Trustee is authorized to return to the Overbidder the $50,000.00 deposit submitted to the Trustee by the Overbidder as its Initial Overbid.

11. The parties to the APA shall undertake all acts reasonable and necessary to consummate the Sale.

**IT IS SO ORDERED.**

# # #

Date: August 23, 2016

Maureen A. Tighe
United States Bankruptcy Judge

-3-

66

**EXHIBIT 4**

### AFFADAVIT UNDER PENALTY OF PERJURY OF ANTHONY HENDERSON

I, Anthony Henderson professionally known as "Krayzie Bone", hereby declare under penalty of perjury, as follows:

1. In 2005, I performed as a side artist with Hakeem Seriki professionally known as Chamillionaire on the recording "Ridin'".

2. As full and complete compensation for my services, I was paid a single, one-time, non-recoupable "all-in" lump sum "buy-out" fee in the amount of $10,000.

3. My agreement with Chamillionaire was and is that I would not be entitled to receive any advances or royalties of any type in addition to the $10,000 I was paid. A copy of my agreement with Chamillionaire.is attached.

4. I have never claimed to be entitled to receive any royalties from SoundExhange for the recording "Ridin', nor will I ever make a claim to be entitled to receive any royalties from SoundExhange for the recording "Ridin', and my agreement with Chamillionaire is that I was not and am not entitled before, now or in the future to receive any royalties from SoundExhange on the recording "Ridin'.

5. Chamillionaire gave me a "featuring" credit on the recording as a professional courtesy in recognition of my stature in the music industry, but that does not change the fact that I was hired and paid a one time fee of $10,000 as a side artist.

I do hereby declare the foregoing statements to be true, correct and accurate, under penalty of perjury pursuant to the laws of the State of California.

Executed this 20 day of March, 2020 in Los Angeles, CA.

By: _____

Anthony Henderson professionally known as "Krayzie Bone"

**68**

| | |
|---|---|
| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address<br><br>Stella Havkin, #134334<br>Havkin & Shrago Attorneys at Law<br>5950 Canoga Avenue, Suite 400<br>Woodland Hills, CA 91364<br>Telephone 818 999-1568<br>Facsimile 818 305-6040<br>email: stella@havkinandshrago.com<br><br><br><br>*Attorney for Plaintiff* | FOR COURT USE ONLY |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br>Anthony Henderson aka Kayzie Bone dba Bone Thugs n Harmony,<br><br><br><br>Debtor(s). | CASE NO.: :10-bk-21216-MT<br><br>CHAPTER: 7<br><br>ADVERSARY NO.: |
| Structured Asset Sales, LLC, a Nevada Limited Liability Company,<br><br><br><br>Plaintiff(s)<br><br>Versus<br><br><br>SoundExchange, Inc,; Anthony Henderson aka Kayzie bone dba Bone Thung n Harmony<br><br><br>Defendant(s) | **SUMMONS AND NOTICE OF STATUS CONFERENCE IN ADVERSARY PROCEEDING**<br>**[LBR 7004-1]** |

TO THE DEFENDANT:  A Complaint has been filed by the Plaintiff against you.  If you wish to defend against the Complaint, you must file with the court a written pleading in response to the Complaint.  You must also serve a copy of your written response on the party shown in the upper left-hand corner of this page.  The deadline to file and serve a written response is _____.  If you do not timely file and serve the response, the court may enter a judgment by default against you for the relief demanded in the Complaint.

A status conference in the adversary proceeding commenced by the Complaint has been set for:

| | |
|---|---|
| **Hearing Date:** _____<br>**Time:** _____<br>**Courtroom:** _____ | **Address:**<br>☐ 255 East Temple Street, Los Angeles, CA 90012<br>☐ 3420 Twelfth Street, Riverside, CA 92501<br>☐ 411 West Fourth Street, Santa Ana, CA 92701<br>☐ 1415 State Street, Santa Barbara, CA 93101<br>☒ 21041 Burbank Boulevard, Woodland Hills, CA 91367 |

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

**You must comply with LBR 7016-1, which requires you to file a joint status report and to appear at a status conference.**  All parties must read and comply with the rule, even if you are representing yourself.  You must cooperate with the other parties in the case and file a joint status report with the court and serve it on the appropriate parties at least 14 days before a status conference.  A court-approved joint status report form is available on the court's website (LBR form F 7016-1.STATUS.REPORT) with an attachment for additional parties if necessary (LBR form F 7016-1.STATUS.REPORT.ATTACH).  If the other parties do not cooperate in filing a joint status report, you still must file with the court a unilateral status report and the accompanying required declaration instead of a joint status report 7 days before the status conference.  **The court may fine you or impose other sanctions if you do not file a status report. The court may also fine you or impose other sanctions if you fail to appear at a status conference.**

**KATHLEEN J. CAMPBELL
CLERK OF COURT**

Date of Issuance of Summons and Notice of Status Conference in Adversary Proceeding: _____

By: _____
       Deputy Clerk

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*December 2016*                                       Page 2                              **F 7004-1.SUMMONS.ADV.PROC**

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Structured Asset Sales, LLC, a Nevada Limited<br>Liability Company, | SoundExchange, Inc,; Anthony Henderson aka<br>Kayzie bone dba Bone Thung n Harmony, |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| Havkin & Shrago Attorney at Law<br>5950 Canoga Avenue #400, Woodland Hills, CA 91367 | |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| ☒ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor       ☐ Other<br>☐ Trustee | ☒ Debtor          ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor       ☒ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Declaratory Relief, Injunction and Turnover of Estate Property.

---

### NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,
    actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
    (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☒ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☒ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☒ 02-Other (e.g. other actions that would have been brought in state court
    if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $                                            150,000.00 |

Other Relief Sought

Injunction and accounting


American LegalNet, Inc.
www.FormsWorkFlow.com

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Anthony Henderson aka Kayzie Bone dba Bone Thugs n Harmony | BANKRUPTCY CASE NO.<br>1:10-bk-21216-MT | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District of California | DIVISION OFFICE<br>San Fernando Valley | NAME OF JUDGE<br>Maureen Tighe |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Stella Havkin | | |
| DATE<br><br>7/17/2020 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Stella Havkin | |

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.


American LegalNet, Inc.
www.FormsWorkFlow.com